York et al., Appellants, *v.* Pennsylvania Public Utility Commission.

Argued April 25, 1972.   Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and NIX, JJ.

reargument refused November 7, 1972.

*Spencer R. Liverant,* with him *George M. Elsesser, Jr., David W. Bupp,* City Solicitor, *Jack H. Barton,* County Solicitor, and *Liverant, Senft and Cohen,* for appellants.

*J. Shane Creamer,* Attorney General, with him *Thomas J. Oravetz, Edward J. Weintraub,* and *Lawrence T. Hoyle, Jr.,* Deputy Attorneys General, for Commonwealth, intervening appellant.

*Philip P. Kalodner,* with him *Dominic J. Ferraro,* for Pennsylvania Public Utility Commission, appellee, and *Charles E. Thomas,* with him *Jack F. Aschinger,* and *Metzger, Hafer, Keefer, Thomas & Wood,* for intervening appellees, General Telephone Co., et al.

OPINION BY MR. JUSTICE ROBERTS, October 4, 1972:

This is an appeal from an order of the Commonwealth Court affirming an order of the Pennsylvania Public Utilities Commission [hereinafter P.U.C. or Commission] approving the merger of three telephone companies. The Commonwealth Court's order also denied a request by the Attorney General of Pennsylvania to intervene as an appellant in the proceedings in the Commonwealth Court. For the reasons which we shall set forth in full below, we affirm the order of the Commonwealth Court.

## I

The controversy which is the basis of this appeal originated in 1966 when the General Telephone Company of Pennsylvania [hereinafter General], the York Telephone and Telegraph Company [hereinafter York Co.] and the Princeton Telephone Company [hereinafter Princeton], pursuant to Section 202 of the Public Utility Law,[1] applied to the P.U.C. for a certificate of public convenience approving their proposal to merge York and Princeton into General. The three telephone companies are each owned by the same holding company, General Telephone and Electronics Corporation,

---

[1] Act of May 28, 1937, P. L. 1053, art. 11, §202, as amended, 66 P.S. §1122 (Supp. 1972).

and the same individual serves as president of all three companies. The City of York and the County of York [hereinafter complainants] filed complaints with the P.U.C. against the telephone companies' application. In addition, the City and County of York also filed complaints directed against York Co.'s redemption, as a part of the merger plan, of its first mortgage bonds.

On October 3 and 4, 1967, hearings were held before a P.U.C. examiner on the application and complaints. Following presentation of evidence by the applicants, the hearings were continued until a future date.

After a considerable delay caused in part by a dispute over certain discovery that was sought by complainants, a further hearing was held before an examiner on March 5, 1969. Thereafter the matter of the application and complaints was argued before the Commission. On December 21, 1970, the P.U.C. issued its order approving the merger and dismissing the complaints of the City and County of York.

Complainants pursued an appeal to the Commonwealth Court from the P.U.C.'s December 21, 1970, order, and obtained a supersedeas staying the Commission's order pending the Commonwealth Court's decision on the merits of the appeal. General, York Co., and Princeton were permitted to intervene as party appellees in the appeal of the City and County of York.

On May 3, 1971, the Attorney General of Pennsylvania petitioned the Commonwealth Court for leave to intervene as an appellant on behalf of the Commonwealth of Pennsylvania. The intervening appellees filed a motion to deny this petition.

On May 5, 1971, the Commonwealth Court heard oral argument on the appeal from the P.U.C. order of December 21, 1970. The Commonwealth Court permitted the Attorney General to appear and argue on the merits of the appeal subject to later consideration

of whether intervention should be allowed. On June 1, 1971, the Commonwealth Court heard argument on the Attorney General's petition to intervene.

On September 14, 1971, the Commonwealth Court issued an order affirming the order of the P.U.C. and denying the Attorney General's petition to intervene.[2] The Attorney General and the City and County of York subsequently petitioned this Court for allowance of appeal which was granted on November 30, 1971.

## II

Complainants' first contention is that this Court's decision in *Northern Pennsylvania Power Co. v. Pennsylvania Public Utility Commission*, 333 Pa. 265, 5 A. 2d 133 (1939), sets forth a standard for determining the permissibility of mergers of utilities subject to the jurisdiction of the Public Utility Commission which is not in accord with the standard adopted by the Legislature in the Public Utility Law. We agree.

Section 202 of the Pennsylvania Public Utility Law[3] provides that: "Upon the application of any public utility and the approval of such application by the commission, evidenced by its certificate of public convenience first had and obtained, . . . it shall be lawful . . . [f]or any public utility . . . to acquire from, or to transfer to, any person or corporation, . . . by any method or device whatsoever, including a consolidation, merger, sale or lease, the title to, or the possession or use of, any tangible or intangible property used or useful in the public service. . . ."

---

[2] Judge (now Justice) MANDERINO dissented without opinion from the Commonwealth Court's order, and Judges WILKINSON and KRAMER dissented from the court's denial of the Attorney General's petition for intervention.

[3] Act of May 28, 1937, P. L. 1053, art. II, §202, as amended, 66 P.S. §1122 (Supp. 1972).

Section 203 of the Public Utility Law[4] makes it clear that a certificate of public convenience approving a merger is not to be granted unless the Commission is able to find affirmatively that public benefit will result from the merger. That section provides in pertinent part: "A certificate of public convenience shall be granted by order of the commission, only if and when the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public . . . ."

Despite the unequivocal command of the Public Utility Law that a utility merger is not to be approved unless the Commission is able to find that the merger will affirmatively benefit the public, this Court's decision in *Northern Pennsylvania Power Co.*, supra, adopted a different standard. There we held that a utility subject to the jurisdiction of the P.U.C. has the right to sell its property and thereby effect a merger with another utility "unless it is established, by competent evidence, that the sale will adversely affect the public in some substantial way." 333 Pa. at 267, 5 A. 2d at 134.

We now believe that our holding in *Northern Pennsylvania Power Co.*, supra, must be abandoned, for it is not in accord with the intent of the Legislature. Section 203 of the Public Utility Law[5] requires that those seeking approval of a utility merger demonstrate more than the mere absence of any adverse effect upon the public. Section 203 requires that the proponents of a merger demonstrate that the merger will affirmatively promote the "service, accommodation, convenience, or safety of the public" in some substantial way.

---

[4] Id. §203, 66 P.S. §1123.

[5] Id.

Although the Commission and the Commonwealth Court did consider themselves bound to follow the now-abandoned standard of *Northern Pennsylvania Power Co.*, supra, we do not believe that a remand to the Commission is in order. We note that the Commission, perhaps in recognition of the weakness of the *Northern Pennsylvania Power Co.* holding, did in fact make an express finding that the proposed merger would affirmatively benefit the public. The P.U.C. in its December 21, 1970, order stated: "[T]he Commission has given considerable thought to the positive aspects of this merger. The benefits that will ultimately accrue to the subscribers of the YORK service area should not be given casual recognition. Analogous to many mergers, the economies that would be forthcoming in this present merger are considerable. In view of the greater bargaining position that the surviving company GENERAL would have in obtaining needed capital in the money markets, and other comparative advantages, such as lower administrative costs, improved labor market conditions, and more importantly, the elimination of the other two corporate companies (YORK and PRINCETON), the beneficiaries of this merger will certainly be the subscribers of YORK and PRINCETON."

The Commission's finding that the merger would affirmatively benefit the public was based in part on the testimony of John C. Herbert, a vice-president and director of all three companies. Mr. Herbert's testimony was accurately and succinctly summarized by Judge MENCER speaking for the Commonwealth Court: "Mr. Herbert testified that the merger would have no adverse effect on the customers of either General, York Telephone or Princeton, but rather there would be benefits to these customers. He testified that the merger would result in a stronger company; that investors will more likely be attracted to a larger company; that

service will be improved; that some paper work and overlapping administrative details in connection with the three companies would be eliminated; that business relations with other businesses and governmental agencies would be simplified. Further, he testified that the merger would be helpful in regard to labor relations and would be beneficial in the administration of tariffs, employee relations, saving of executive time and in producing economies in insurance costs. His testimony could fairly be summarized as a persuasive assertion that the merger will produce operating economies and regulatory simplification that should benefit all parties." 3 Pa. Commonwealth Ct. at 276-77, 281 A. 2d at 264.

In light of the Commission's explicit finding that the merger will affirmatively benefit the public, a finding fully supported by the record, there is no need or reason to remand this matter to the Commission.

Complainants' next contention is that the Commission erroneously refused to consider the potential effect of the proposed merger upon the rates to be paid by consumers. This contention must be rejected. A careful analysis of the proceedings below indicates that the Commission did not flatly refuse to consider the effect of the merger upon rates, but merely found that complainants had produced no evidence that the merger would have any detrimental effect upon rates. In fact, the Commission's explicit finding that the merger would result in "considerable" economies[6] can only be taken as an indication of the Commission's belief that the merger would in fact have a beneficial effect upon rates.

We agree with complainants that the Commission should consider, at least in a general fashion, the effect that a proposed merger is likely to have on future rates

---

[6] See text at p. 142, supra.

to consumers. Along with the likely effect of a proposed merger upon the service that will be rendered to consumers, the probable general effect of the merger upon rates is certainly a relevant criteria of whether the merger will benefit the public.

However, in the proceedings before the Commission, complainants advanced only two arguments in support of their contention that the merger would result in higher rates. Both of these arguments were properly rejected by the Commission.

First, complainants argued that as a result of refinancing necessitated by the merger, the surviving company would have interest costs on its debt greater than the aggregate interest costs of the constituent companies. However, since interest costs are a "below the line" expense—that is they are not included in the operating expenses that a utility is entitled to collect from its customers[7]—a utility's level of interest costs will have no direct effect upon rates to consumers. As a "below the line" expense, the level of interest costs will proximately affect only the owners of the utility's equity, and not its customers.

Complainants' second argument in support of their contention that the merger would result in higher rates

---

[7] 43 Am. Jur., Public Utilities and Services, §153, states: "Interest on Indebtedness.—Interest charges on borrowed capital are not allowable as operating expenses for rate-making purposes as between a public utility company and its consumers. While such charges must be paid by the company, they are to be paid out of the return allowed the company for the use of its property and capital devoted to the public service. A further allowance of interest charges on borrowed capital would doubly burden the consumers for the use of such capital."

The Pennsylvania rule is in accord with the general rule. See, e.g., *Borough of Susquehanna Depot v. Canawacta Water Supply Co.*, 35 P.U.C. Decisions 411 (19  ); *Pennsylvania Public Utility Commission v. North Penn Gas Co.*, 25 P.U.C. Decisions 319 (19  ); *Pennsylvania Public Utility Commission v. Harrisburg Taxi and Baggage Co.*, 22 P.U.C. Decisions 511 (19  ).

was that the telephone customers now served by York Co. presently pay lower rates than do the customers of General and Princeton. Complainants contend that after the merger the surviving company will have the right to file "system-wide" rates which would raise the cost of telephone service to consumers in the York area. We need not presently determine this issue.

The Commission, however, included in its order approving the merger a condition which will enable the customers formerly served by York Co. to effectively protect their rate advantages over the customers of General and Princeton. The Commission expressly required as a condition of its approval of the merger: "That General Telephone Company of Pennsylvania maintain separate operating records for the respective service areas of the former York Telephone and Telegraph Company and Princeton Telephone Company in all matters, including accounting, service, and rates."

Thus the Commission correctly rejected complainants' argument that the merger would inevitably have the effect of raising the rates of the York area telephone users.

Not only did the Commission correctly reject complainants' arguments that the merger would have the effect of raising rates, but the Commission indicated that the merger would likely have the opposite effect. The Commission expressly found that "the economies that would be forthcoming in this present merger are considerable . . .," and that "the beneficiaries of this merger will certainly be the subscribers of YORK and PRINCETON."[8]  Therefore, complainants' contention that the Commission refused to consider the potential effect of the proposed merger on the rates to be paid by consumers must be rejected.

---

[8] See text at p. 142, supra.

Complainants' final contention is that York Co.'s redemption of its outstanding first mortgage bonds violated Section 601(a) of the Public Utility Law.[9] We agree with the Commonwealth Court and the Commission that complainants' contention is erroneous.

Section 601(a) provides: "[E]very public utility, before it shall execute, cause to be authenticated, deliver, or make any change or extension in any term, condition, or date of, . . . any bond, note, trust certificate, or other evidence of indebtedness of itself, any or all of which acts are hereinafter included in the term 'issuance of securities,' shall have filed with the commission, and shall have received from the commission, notice of registration of a document to be known as a securities certificate . . . ."

Section 603(a) of the Public Utility Law[10] further provides that: "Upon the submission or completion of any securities certificate . . . the commission shall register the same if it shall find that the issuance or assumption of the securities in the amount, of the character, and for the purpose therein proposed, is necessary or proper for the present and probable future capital needs of the public utility filing such securities certificate; otherwise it shall reject the securities certificate."

As a part of the refinancing necessitated by the merger plan, York Co. redeemed, as of July 1, 1966, two series of its first mortgage bonds having outstanding an aggregate principal amount of $6,000,000. York Co. did not file a securities certificate with the P.U.C. in connection with its redemption of these bonds. However, York Co. had obtained from the Commission registration of securities certificates covering these bonds

---

[9] Act of May 28, 1937, P. L. 1053, art. VI, §601(a), as amended, 66 P.S. §1241(a).

[10] Id. §603(a), 66 P.S. §1243(a).

when the bonds were issued, one series in 1955 and one series in 1958.

Complainants contend that York Co.'s redemption of its bonds constitutes a "change . . . in . . . [an] evidence of indebtedness of itself," and that York Co.'s failure to obtain registration of a securities certificate in connection with the redemption renders the redemption unlawful. We believe that complainants have lifted the above-quoted words of Section 601(a) out of context.

Section 601(a) carefully enumerates the events that trigger a utility's obligation to obtain registration of a securities certificate. Section 601(a) first establishes that the approval of the Public Utility Commission must be obtained when the security is initially issued—"before it shall execute, cause to be authenticated, [or] deliver . . . any bond . . . or other evidence of indebtedness of itself." Next, Section 601(a) specifies that a securities certificate must be registered before any change can be made in the *terms* of a security whose issuance was previously approved by the Commission. Section 601(a) expressly provides that the obligation to obtain registration of a securities certificate arises upon the "change or extention *in any term, condition, or date of*," a security (emphasis added).

Here York Co. redeemed its first mortgage bonds in accordance with the terms of redemption expressly provided in those securities. Those terms of redemption were approved by the Commission when York Co., at the time the bonds were issued, obtained registration of a securities certificate. York Co.'s redemption of its bonds according to their specified terms of redemption certainly did not entail any "change or extension in any term, condition, or date of" the bonds. Accordingly complainants' contention that York Co. was obligated to obtain registration of a securities certificate

in connection with the redemption of its bonds must be rejected.

### III

Finally, we must decide whether the Commonwealth Court properly refused the request of the Attorney General of Pennsylvania to intervene as an appellant in the proceedings in the Commonwealth Court. We believe that the Attorney General's request was properly refused.

We recognize that the Attorney General's powers of intervention, both under statute[11] and at common law,[12] are broad. However, we agree that to allow the Attorney General to intervene as an appellant in an appeal from an order of the Public Utility Commission would create an irreconcilable conflict of interest and thus cannot be permitted. We take the liberty of quoting extensively from the opinion of the Commonwealth Court on this point: "[F]atal to the Attorney General's position here is the statutory duty that he has to represent the Public Utility Commission and to be allowed to intervene would create an irreconcilable conflict of interest. We are in full accord with what Judge WOODSIDE said in Ault Unemployment Compensation Case, 188 Pa. Superior Ct. 260, 146 A. 2d 729 n.1 (1958): 'The Attorney General appeared personally before us and argued this and companion cases in favor of the claimants and *against* the Unemployment Compensation Board. We are of the opinion that he should not have argued *against* an agency of the Commonwealth which the legislature directed him to represent in litiga-

---

[11] See, e.g., Act of May 28, 1915, P. L. 616, §1, as amended, 12 P.S. §145; Act of April 9, 1929, P. L. 177, art. IX, §904(b), 71 P.S. §294(b).

[12] See, e.g., *Commonwealth ex rel. Minerd v. Margiotti*, 325 Pa. 17, 188 Atl. 524 (1936).

tion.  See Section 903 (b) of The Administrative Code of April 9, 1929, P. L. 177, 71 PS §293.

" 'The attorney general is charged by The Administrative Code with the duty of not only representing the boards and commissions in court but also of giving them legal advice.  See Section 902, 71 PS §292 and section 512, 71 PS §192.  However, within their respective fields these boards and commissions are given authority to make decisions which involve not only findings of fact, but also conclusions of law.  They must determine the law applicable to the facts of the cases before them.  As we view it, the legislature did not intend that the attorney general should examine each case before these quasi-judicial bodies to determine how he thinks the board or commission should decide them.  The legislature provided for the review of these decisions by courts to which appeals are allowed.  Appeals from these decisions are not to the attorney general.

" 'This brings us to the question of what the attorney general should do when he personally believes the decision of such board or commission is erroneous.  The legislature directs the attorney general to represent the board or commission before the court.  He cannot carry out this duty if he substitutes his own personal views of the law for the board's decision.  On the other hand, we recognize that a lawyer may have such strong convictions concerning a legal principle that he feels he can, in good conscience, argue only one position to the court.

" ' . . . .

" 'We do not question the attorney general's motives.  He undoubtedly did what he conceived to be his duty as an officer of the Commonwealth and of this Court.  Furthermore, we recognize that the duties of an attorney general cannot always be measured by the same yard-stick used to measure the duties of private

counsel.   There are occasions where an attorney general is required to represent both sides of a case, as, for example, when the Highway Department appeals from a Public Utility Commission order.   In such cases he cannot believe both sides to be right, and yet he is charged by statute with presenting both sides to the court.   This, of course, is done through deputies or counsel assigned to the agencies involved, but inasmuch as all of these represent the attorney general himself, the attorney general is on both sides of the case.

" 'It has been suggested that an attorney general should never be on both sides of a case.   Legal disputes between departments or even between a department and a board or commission *involving administrative problems* should be, and are, settled by the opinions of the attorney general, which as to such agencies have the effect of law.   An attorney general has no problem in determining his duty as to these matters.   His soul-searching is induced by the problems that arise out of the decisions of the quasi-judicial boards and commissions.   Here he may frequently disagree with the decisions of these boards and commissions, and yet under the law which he must administer with fidelity, he is charged with the duty of representing them in court. These boards and commissions are not in the category of ordinary lay clients, but are quasi-judicial bodies, more nearly in the category of courts, and therefore not as directly subject to the legal advice of their lawyer as are lay clients.'

"If intervention would be permitted, counsel for the Commission would be placed in a position of having a statutory duty of defending an order of the Commission while at the same time being controlled and directed by the Attorney General who is advocating a position directly opposite to the order of the Commission.   The Act of March 31, 1937, P. L. 160, §9, 66 P.S. §460, reads

as follows: 'The office of counsel to the Pennsylvania Public Utility Commission is hereby created, such counsel to be appointed by the Attorney General, with the approval of the Governor. The Attorney General may also from time to time, with the approval of the Governor, appoint such assistant counsel to the Pennsylvania Public Utility Commission as may be required for the proper conduct of its work. The compensation of the counsel and assistant counsel of the Pennsylvania Public Utility Commission shall be fixed by the commission, with the approval of the Governor. Such counsel or assistant counsel shall attend the hearings before the commission or a commissioner, or a special agent or examiner, and conduct the examination of witnesses when requested to do so by the Commission or a commissioner, and shall represent the commission upon appeals and other hearings in the courts of common pleas and in the Superior and Supreme Courts, or other courts of the Commonwealth of Pennsylvania, or in any Federal court, and in actions instituted to recover penalities and to enforce regulations and orders of the commission. Such counsel and assistant counsel shall also assist the Attorney General in conducting all mandamus, injunction, and quo warranto proceedings at law or in equity, instituted by him for the enforcement of the regulations and orders of the commission, and shall perform such other professional duties as may be required of them by the commission.'

"Since the Attorney General has the power to appoint counsel for the Commission, he likewise has the power to remove such counsel. If the Attorney General were permitted to intervene in opposition to the Commission's order, and as an opposing advocate to the counsel for the Commission, who is subject to removal by the Attorney General, then the Commission would be denied the effective representation of counsel to

which it is entitled by statute. We cannot sanction such an irreconcilable conflict of interest." 3 Pa. Commonwealth Ct. at 282-86, 281 A. 2d at 267-68 (1971) (footnote omitted) (emphasis in original).

We also agree with the Commonwealth Court's conclusion that the Public Utility Law itself bars the Attorney General from intervening as an appellant in an appeal from an order of the Public Utility Commission.

. "Section 1104 of the Public Utility Law, 66 P.S. §1434, provides as to parties on appeal: 'In any appeal to the Superior Court,[13] the court may order the complainant in the original complaint to be added to the record as a party, and such party shall be permitted to join in the defense of the order of the commission at issue. The court may also, upon application by petition and cause shown, permit any person, corporation, or municipal corporation to intervene in such proceedings and be added as a party appellant or appellee therein. Notice of such application to intervene shall be served upon the commission within three days of the filing of such application.'

"The definitions of 'person', 'corporation' and 'municipal corporation' under Section 2 of the Public Utility Law, 66 P.S. §1102, do not include the Commonwealth which therefore does not qualify for intervention under said Section 1104. The Public Utility Law provides a comprehensive and exclusive system of regulation for utilities and the prescribed procedure for appeal must be followed. In *George Hyam Associates, Inc. v. Pennsylvania Public Utility Commission,* 199 Pa. Superior Ct. 3, 6, 184 A. 2d 414, 415 (1962), the Superior Court said: 'The right of appeal in public utility proceedings is necessarily statutory and the conditions under which this right may be exercised are to

---

. [13] Appeal is now to the Commonwealth Court. Act of July 31, 1970, P. L. 673, art. IV, §403(1), 17 P.S. §211.403(1).

be found in the provisions of the law for such appeals. Franke v. Johnstown Fuel Supply Company, 70 Pa. Superior Ct. 446, 451, 452; Al Zeffiro Transfer and Storage Company v. Pennsylvania Public Utility Commission, 195 Pa. Superior Ct. 214, 217, 171 A. 2d 800. The prescribed procedure must be strictly pursued. Smith v. Scholl, 262 Pa. 124, 127, 105 A. 41; Colteryahn Sanitary Dairy v. Milk Control Commission, supra, 332 Pa. 15, 23, 24, 1 A. 2d 775; Oteri Appeal, 372 Pa. 557, 561, 94 A. 2d 772. This is particularly true of special statutory appeals from action of administrative bodies. Blank v. Board of Adjustment, 390 Pa. 636, 640, 136 A. 2d 695.'

"We conclude that the appeal and review provisions of the Public Utility Law do not provide for intervention by the Commonwealth; further, that these provisions prevail over the provisions of the Act of May 28, 1915, as amended, upon which the Attorney General relies for intervention in this case. *See* Act of May 28, 1937, P. L. 1019, art. VII, §91, 46 P.S. 591." 3 Pa. Commonwealth Ct. at 286-87, 281 A. 2d at 268-69 (1971) (footnote omitted).

Accordingly the order of the Commonwealth Court is affirmed.

Mr. Justice EAGEN concurs in the result.

Mr. Justice MANDERINO took no part in the consideration or decision of this case.