IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tanya J. McCloskey, Acting      :
Consumer Advocate,              :
                Petitioner      :
                            :
           v.              : No. 1624 C.D. 2017
                            : Argued:  September 14, 2018
Pennsylvania Public Utility     :
Commission,                     :
              Respondent      :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge (P.)


OPINION BY
SENIOR JUDGE PELLEGRINI             FILED:  October 11, 2018


        Aqua Pennsylvania Wastewater, Inc.[1] (Aqua) filed an application with the Pennsylvania Public Utility Commission (Commission) under Sections 1329 and 1102[2] of the Public Utility Code (Code), 66 Pa.C.S. §§ 1329 & 1102, for the approval of the acquisition of the wastewater system assets of New Garden Township

---

[1] Aqua is a subsidiary of Aqua Pennsylvania, Inc. (Aqua PA), which provides water and wastewater utility services to approximately 450,000 customers.  Aqua's wastewater service involves the collection, transportation, treatment and disposal of wastewater for the public to approximately 20,000 customers in Adams, Bucks, Carbon, Chester, Clearfield, Delaware, Lackawanna, Luzerne, Monroe, Montgomery, Pike, Schuylkill and Wyoming Counties.  Aqua operates 31 wastewater treatment plants in Pennsylvania.  Both Aqua and Aqua PA employ approximately 600 individuals with expertise in water and wastewater services.

[2] Section 1102 authorizes the Commission to issue a certificate of public convenience permitting a regulated public utility to offer service in a different territory and acquire property used and useful in the public service.  66 Pa.C.S. § 1102(a).

(Township) and the New Garden Sewer Authority (Authority) (collectively, New Garden),[3] a certificate of public convenience to furnish the wastewater service to the public in the Authority's service area as well as the approval of the ratemaking rate base based on the acquisition price and costs for the New Garden wastewater system assets.

## I.

## A.

Enacted in 2016, Section 1329 of the Code, 66 Pa.C.S. § 1329, added a new provision to Chapter 13 of the Code to provide how municipal or authority-owned water and wastewater systems assets are to be valued for ratemaking purposes when those assets are acquired by investor-owned water and wastewater utilities or entities. It sets forth a voluntary process for establishing a value for the acquired utility's assets using fair market value methodology rather than the original cost of construction of the facilities minus the accumulated depreciation. Under that process, the acquiring utility chooses two valuation experts from a list the Commission maintains, each of whom is to conduct an appraisal to determine fair market value in accordance with the Uniform Standards of Professional Appraisal Practice.[4] The acquiring public utility or entity also engages a licensed engineer to conduct an

_____

[3] New Garden's wastewater system is comprised of three service areas: the East End Service Area served by the East End Wastewater Treatment Plant (East End WWTP); the South End Service Area served by the South End Wastewater Treatment Plant (South End WWTP); and the Avondale Service Area served by the Avondale Wastewater Treatment Plant (Avondale WWTP), which is owned by the Borough of Avondale (Borough).

[4] _See_ http://www.appraisalfoundation.org/imis/TAF/Standards/Appraisal_Standards/Uniform_Standards_of_Professional_Appraisal_Practice/TAF/USPAP.aspx?hkey=a6420a67-dbfa-41b3-9878-fac35923d2af (last visited September 26, 2018).

assessment of the tangible assets of the selling utility which shall be incorporated into the appraisals. 66 Pa.C.S. § 1329(a). The original source of funding for any part of the water or sewer assets of the selling utility shall not be relevant to determine the value of said assets. 66 Pa.C.S. § 1329(d)(5).

The valuation determined from this process is the rate base added to the acquiring utility's rate base in its next rate base case proceeding. 66 Pa.C.S. § 1329(c).[5] Also added to the rate base are transaction costs incurred by the acquiring utility or entity but not exceeding 5% of the fair market value of the selling utility or a fee approved by the Commission. In sum, Section 1329 allows a utility to cover the full costs of its investment in purchasing the new system from ratepayers. Applied to the rate base is a rate of return or profit that a utility is to enjoy from owning and operating the system, and together with anticipated revenues and expenses, rates are determined.[6] The Commission must issue a final order approving or denying the acquisition within six months of the filing date of an application meeting the requirements of § 1329(d)(2).

---

[5] Section 1329 also allows the acquiring entity's post-acquisition improvement costs not recovered through a distribution system improvement charge to be deferred for book and ratemaking purposes.

[6] *See, e.g.*, Garfield, Paul J. & Lovejoy, Wallace F., Public Utility Economics, 116 (Englewood Cliffs, N.J.: Prentice-Hall, 1st ed. 1964) ("The return is the amount of money a utility earns, over and above operating expenses, depreciation expenses and taxes, expressed as a percentage of the legally established net valuation of utility property, the rate base"); *Pennsylvania Power Company v. Pennsylvania Public Utility Commission*, 561 A.2d 43, 46 (Pa. Cmwlth. 1989), *aff'd*, 587 A.2d 312 (Pa. 1991), *cert. denied*, 502 U.S. 821 (1991).

In addition, Section 1329(d)(1) states that the acquiring public utility must apply for a Certificate of Public Convenience (Certificate) under Section 1102 of the Code.  As part of that Section 1102 application, the utility must provide copies of the appraisals; the agreed purchase price; the ratemaking rate base of the transaction; and closing costs and a tariff containing a rate equal to the existing rates of the selling utility at the time of the acquisition and a rate stabilization plan, if applicable.  66 Pa.C.S. § 1329(d)(1).  A rate stabilization plan is defined as "a plan that will hold rates constant or phase rates in over a period of time after the next base rate case."  66 Pa.C.S. § 1329(g).  Section 1329(d)(4) provides that the tariff submitted shall remain in effect until such time as new rates are approved in new base rate cases.

To obtain a Certificate, the acquiring public utility has the burden, by preponderance of the evidence, to establish that it is technically, legally and financially fit to provide the proposed service.  *Seaboard Tank Lines, Inc. v. Pennsylvania Public Utility Commission*, 502 A.2d 762 (Pa. Cmwlth. 1985); 66 Pa.C.S. § 332(a).  A certified public utility such as Aqua enjoys a presumption that it is fit.  Additionally, Section 1103(a) of the Code provides that the acquiring utility must prove that granting it a Certificate is necessary or proper for the service, accommodation, convenience or safety of the public, as well as allowing the Commission to place conditions on the transfer.  66 Pa.C.S. § 1103(a).  That provision provides, in relevant part:

> A [Certificate] shall be granted by order of the [C]ommission, only if the [C]ommission shall find or determine that the granting of such [Certificate] is necessary or proper for the service, accommodation, convenience, or safety of the public.  The [C]ommission, in granting such

[Certificate], may impose such conditions as it may deem to be just and reasonable. In every case, the [C]ommission shall make a finding or determination in writing, stating whether or not its approval is granted. Any holder of a [Certificate], exercising the authority conferred by such [Certificate], shall be deemed to have waived any and all objections to the terms and conditions of such [Certificate].

*Id.*

## B.

In its application, Aqua asked the Commission to approve its acquisition of the water system owned by the Township and the Authority and the Asset Purchase Agreement (APA) that the buyer and seller negotiated. Under the terms of the APA, Aqua would pay the Township $29.5 million for the assets. That is, $10.9 million or 59% more than the depreciated original cost of the system. Aqua also asked the Commission to establish the purchase price of $29.5 million as the rate base for the acquired assets to be included in its next rate base proceeding based on two fair market value appraisals obtained by Aqua and the Township.[7]

In addition to the purchase price and proposed rate base, under the APA, Aqua agreed with New Garden:

- Not to increase the current rates charged to the New Garden customers for 730 days after closing.

---

[7] The average of the two fair market value appraisals provided in Aqua's filing was $32.1 million that is higher than the purchase price amount. (Reproduced Record (R.R.) at 177a.) Section 1329 requires use of the lesser of the purchase price or the average fair market value. 66 Pa.C.S. § 1329(c)(2).

- That for the first 10 years of Aqua ownership, Aqua agreed to limit rate increases for the New Garden customers to no more than a compounded 4% per year.

- Aqua agreed to fund approximately $2.5 million in projects in the acquired territory.

As part of its application, Aqua did not submit a rate stabilization plan.

The Commission's Bureau of Investigation and Enforcement (I&E), the Office of Consumer Advocate (OCA) and the Office of Small Business Advocate (OSBA) each filed protests to the application contending that approving the sale and granting the Certificate was not in the public interest. None of those parties challenged Aqua's fitness to acquire the New Garden system. The matter was then referred to a Commission Administrative Law Judge (ALJ) for hearing.[8]

## II.

## A.

At the scheduled hearing, testimony and exhibits were entered into the record and cross-examination was conducted. Among those exhibits entered into

---

[8] Before the hearing, I&E filed a motion to bifurcate the proceedings. It contended that while the Section 1329 part of the proceeding was required to be decided within six months, there was no such requirement for the Section 1102 part of the proceeding. It requested that the latter be bifurcated from the Section 1329 proceeding and that the two parts of the application be adjudicated on separate timelines. The ALJ denied the motion. I&E filed a petition for expedited interlocutory review which the Commission granted, but went on to deny its request holding that Section 1329 does not contemplate an extended consideration period for applications filed by existing, certificated public utilities.

evidence were the appraisals of two Commission-approved valuation experts that resulted in establishing the $29.5 million purchase price of the New Garden system.[9]

To meet Section 1103's requirement that the proposed transaction will promote the service, accommodation, convenience or safety of the public in some substantial way, Aqua entered evidence that the acquisition will have no adverse effects on the service provided to existing customers or that rates of New Garden customers or existing Aqua customers will be lessened because:

- The transaction will promote the Commission's goals of consolidation and regionalization of systems thereby enabling better management practices, economies of scale, and greater environmental and economic benefits.

- The two proposed capital projects costing approximately $2.5 million as well as its financial and technical ability to complete these projects for the benefit of the New Garden customers.

- It had four of the Company's four other wastewater treatment plants within ten miles of the New Garden assets which would allow the operation of the acquired system without any additional operational or administrative staff.

- It would realize operational efficiencies and mitigate future rate increases because the increased customer base resulting from the acquisition would allow future infrastructure costs to be shared by the Company's customers at a lower incremental cost and that expected significant future customer growth would allow for additional long-term cost sharing and further dilute the cost of service across more customers.

---

[9] No challenge involving the appraisal valuations or acquisition prices is at issue in this appeal.

- That it did not anticipate significant investment needs in the future, excluding the $2.5 million in capital projects, and that the system will be less costly to operate under its ownership.

Aqua, however, provided no evidence regarding the effect on rates by increases on the rate base or the rate impact of the rate freeze provision or Compound Annual Growth Rate (CAGR) limitation to New Garden on existing ratepayers.

The OCA offered witnesses and evidence showing that rates would substantially increase for Aqua's customers if the sale were approved. Those witnesses testified that Aqua's existing 19,784 wastewater customers have an average rate base cost per ratepayer of $3,714. However, the $29.5 million rate base for the 2,106 New Garden ratepayers would mean that the average rate base cost per New Garden customer would be $14,007. Because that average rate base is nearly four times Aqua's existing rate, the OCA contended that once the costs of New Garden's new rate base are spread to all existing Aqua ratepayers, the rate base attributed to them would increase by 27%. Aqua also agreed to fund approximately $2.5 million in projects in the acquired territory that would also be added to Aqua's existing rate base which would have a further effect on rates.

In addition to the increase in rates necessitated by the $29.5 million purchase price and other increases to the rate base, the OCA also contended that Aqua's purchase agreement placed unwarranted additional burdens on Aqua's existing ratepayers because it froze rates charged to New Garden ratepayers for 730 days after closing, as well as limited rate increases to no more than a compounded 4% per year over ten years.

8

The OCA contended that its undisputed evidence showed that those rate limitations meant that Aqua's costs of acquiring the New Garden system would far exceed the revenues from the New Garden customers, necessitating that Aqua ratepayers' rates will be further increased. The OCA contended that in Aqua's next rate base case, limited to the new rate base only, if the increase in rate bases are allocated to:

- Aqua's existing wastewater customers, their rates would increase by 19%.

- New Garden customers, their rates would increase by 101%.

- All wastewater customers (existing and acquired), their rates would increase by 16%.[10]

Because of the effect the acquisition would have on both Aqua's existing ratepayers and New Garden ratepayers, the OCA argued that the application should be denied as against the public interest.[11]

---

[10] At footnotes 9, 10 and 11 of the OCA's brief, it sets forth the calculations contained in the record that support the percentage increase in rates.

[11] I&E argued that the rate freeze provision constituted a rate stabilization plan and that Aqua should support its plan with testimony, schedules and work papers pursuant to the Commission's Implementation Order. (R.R. at 262a.) The ALJ agreed that the rate freeze proposal was a rate stabilization plan but the Commission reversed. I&E did not appeal and this matter is not before us.

## B.

Though finding a proposed rate base value of $29.5 million for the required assets was reasonable, the ALJ denied the request for a Certificate because "Aqua has failed to show . . . that all affected parties, including its existing customers, will realize any affirmative public benefits as a result of approval of Aqua's application." (OCA's Brief, Appendix A at 46.) While he found that benefits would inure to existing New Garden ratepayers, Aqua's existing ratepayers "will have to bear a disproportionate share of the revenue requirements in future rate base cases . . . ." (OCA's Brief, Appendix A at 44.) He also found that the affirmative benefits suggested by Aqua were "overly general in nature and Aqua has not demonstrated or quantified how they specifically benefit the public in this proceeding." *Id*. In his public interest discussion, the ALJ explained his reasoning as follows:

> Aqua has failed to prove that its existing customers will realize any such benefits. In fact, record evidence supports OCA's and I&E's positions that approval of the Application may harm Aqua's existing customers to the extent that, on balance, approval of the Application is not in the public interest.

> There is no record evidence showing that Aqua will be able to operate the New Garden system more economically or efficiently than it is currently being operated by New Garden.

> Aqua also argues that approval of the Application will promote the goals of system consolidation and regionalization. It makes the general assertion that New Garden is exactly the kind of system that the Commission encourages utilities such as Aqua to acquire. (Aqua Main Brief, p. 23). Aqua provides no additional explanation or support for this position.

> As noted, record evidence shows that the New Garden Sewer Authority is a financially stable entity that is capable

10

of continuing to operate the system in an efficient and economical manner. There is no record evidence to suggest that this is not the case. It is not a troubled system whose customers will benefit from a takeover by a more financially sound company. Approval of Aqua's Application will undoubtedly benefit New Garden and Aqua, with a purchase price based on fair market value and an enhanced rate base value for the acquired assets. Merely stating that the transaction will promote consolidation and regionalization, however, does not adequately explain how that constitutes an affirmative public benefit to New Garden's and Aqua's existing customers.

(OCA's Brief, Appendix A at 45.)

The ALJ also determined that the rate freeze was a rate stabilization plan within the meaning of Section 1329 and that Aqua should have provided supporting information regarding the impacts. (OCA's Brief, Appendix A at 26, 28.)

However, the ALJ went on to state that in the event the Commission ultimately approves Aqua's application:

I recommend that it consider the attachment of the conditions proposed by the OCA, as follows: The Commission retains the authority to allocate revenues, if appropriate, to the New Garden Township customers that are in excess of the restrictions outlined in the APA. Aqua and its shareholders should bear all risk of a shortfall between revenues it is permitted to recover under its agreement with New Garden and the costs that the Company will incur with respect to this system. To the extent that Aqua is unwilling or unable to charge costs in excess of the limitations provided in the Asset Purchase Agreement, the excess costs should be borne by shareholders and not spread to other ratepayers. By attaching these conditions to approval of the Application, the acquired customers would enjoy the benefits of the rate

11

commitments negotiated and memorialized in the APA while assuring that Aqua's existing customers were not unfairly burdened by any revenue shortfalls resulting from those commitments.

(OCA's Brief, Appendix A at 28.)

## C.

Aqua appealed the determination to the Commission, which reversed the ALJ, approving a $29.5 million ratemaking rate base for the New Garden system and directing that a Certificate be issued to Aqua for New Garden's previous service area. The Commission concluded that Aqua proved that the acquisition would affirmatively benefit the public, contrary to the ALJ's conclusion that the public benefits were too general in nature. It reasoned that further consolidation of the water and wastewater industry in Pennsylvania might also result in greater economic and environmental benefits to customers. In addition, the New Garden system would be able to draw upon the experience of wastewater professionals throughout the much larger Aqua organization, noting Aqua's four existing wastewater treatment plants within ten miles of the New Garden system. It also found that the acquisition would have no negative effect on the quality or quantity of service provided to existing Aqua customers. Finally, the Commission concluded that approval of the transaction was consistent with the General Assembly's clear support and encouragement of municipal wastewater acquisitions at valuation levels higher than traditional original cost measures.

Addressing the concern that the addition of existing Aqua ratepayers will have disproportionate rate increases to subsidize the new market transaction, the

12

Commission attached additional conditions of approval. *See* 66 Pa.C.S. § 1103(a); 66 Pa.C.S. § 1329(d)(3)(ii). As a condition for approving the acquisition, the Commission directed Aqua to develop and file a cost-of-service study in its next rate case that separates the costs, capital and operating expenses of providing wastewater service to New Garden customers as a stand-alone rate group. It stated that these conditions would ensure that all parties and the Commission would be informed of the overall rate impact that the acquisition will have on Aqua customers and, alternatively, the result of establishing New Garden as a separate rate zone.

It then went on to acknowledge that the APA provides that New Garden customers' rates will remain the same for two years and capped for the next ten years. As a condition of approval, it adopted the ALJ's recommendation regarding the impact on rates under the APA freezing and limiting New Garden ratepayers' rates ordering:

> 10. That at the time of filing its next base rate case, Aqua Pennsylvania Wastewater, Inc., shall submit a cost- of-service study or analysis that separates the costs, capital, and operating expenses of providing wastewater service to the customers of New Garden Township and New Garden Township Sewer Authority as a separate rate class.
>
> 11. That at the time of filing its next base rate case, Aqua Pennsylvania Wastewater, Inc., shall submit an analysis that addresses the effects of designing rates for the customers of New Garden Township and New Garden Township Sewer Authority rates as a separate, stand-alone rate zone.
>
> 12. That the Commission retains the authority to allocate revenues, if appropriate, to the New Garden Township customers that are in excess of the restrictions outlined in the [APA]. Aqua Pennsylvania Wastewater, Inc., and its shareholders should bear all risk of a shortfall between revenues it is permitted to recover under its Asset Purchase

13

Agreement with New Garden Township and New Garden Township Sewer Authority and the costs that Aqua Pennsylvania Wastewater, Inc., will incur with respect to the acquired system. To the extent that Aqua Pennsylvania Wastewater, Inc., is unwilling or unable to charge costs in excess of the limitations provided in the Asset Purchase Agreement, the excess costs should be borne by its shareholders and not spread to other ratepayers.

(OCA's Brief, Appendix B at 73-74.)[12]

The Commission's Vice Chairman, Andrew G. Place (Vice Chairman Place), filed a dissenting statement, stating, in part, that:

The available and credible evidence of record does not demonstrate the presence of such net affirmative benefits, especially for the existing Aqua ratepayers. The alleged affirmative benefits put forward by Aqua are rather speculative and will, if then, accrue over a very long time. I&E succinctly states [in its brief]:

Second, with regard to the alleged long-term operational efficiencies and customer growth and cost sharing, these vague generalizations of what might occur in the next 100 years do not amount to the

---

[12] We note that Section 1304 of the Code provides in part that:

No public utility shall, as to rates, make or grant unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation, to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.

66 Pa.C.S. § 1304.

14

requisite showing of affirmative public benefits. The Commission simply cannot rely on Aqua's speculation about potential growth in the New Garden area or vague assertions that there may be some operational efficiencies to determine that this acquisition is in the public interest and provides substantial, affirmative public benefits.

(OCA's Brief, Appendix D at 1) (quoting I&E, R. Ex., at 8.)

As to that portion of the Commission's order for a cost-of-service study relating to possibly separating out New Garden ratepayers as a new rate class or making New Garden a new rate zone, Vice Chairman Place stated:

I have serious doubts whether such conditions will provide concrete and sustainable safeguards while protecting the broader public interest and, particularly, the interests of Aqua's existing customer base. Approving the overall transaction, but then potentially subjecting the relatively small customer base of New Garden with a prospectively allocated revenue requirement that would be clearly unsustainable and would largely relate to the same system is both counterintuitive and does not serve the public interest. Most likely Aqua's shareholders will also refuse to accept any additional risk beyond the acquisition price of $29.5 million that far exceeds the original cost of the acquired system. Therefore, the long-term viability of the safeguard condition is clearly questionable.

(OCA's Brief, Appendix D at 2) (footnotes omitted).

The OCA then brought this appeal.

15

**III.**

Central to this appeal is the question of what factors the Commission must consider before approving an acquisition of a public system by a private utility under Section 1329 of the Code. While Section 1329 establishes the method for determining the ratemaking rate base for the acquired plant, Sections 1102 and 1103 of the Code, together with Section 1329, require an applicant not only show that no harm will come from the transaction but also to establish that substantial affirmative benefits flow to its ratepayers. *City of York v. Pennsylvania Public Utility Commission*, 295 A.2d 825, 828 (Pa. 1972). To establish that there are substantial affirmative benefits, our Supreme Court held that:

> [T]hose seeking approval of a utility merger [must] demonstrate more than the mere absence of any adverse effect upon the public. Section [1103] requires that the proponents of a merger demonstrate that the merger will affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way.

*Id.* at 828.

> Our Supreme Court has further held:

> In conducting the underlying inquiry, the Commission is not required to secure legally binding commitments or to quantify benefits where this may be impractical, burdensome, or impossible; rather, the [Commission] properly applies a preponderance of the evidence standard to make factually-based determinations (including predictive ones informed by expert judgment) concerning certification matters.

*Popowsky v. Pennsylvania Public Utility Commission*, 937 A.2d 1040, 1057 (Pa. 2007) (*Verizon*). In addition, "in some circumstances conditions may be necessary to satisfy the Commission that public benefits sufficient to meet the requirement of Section 1103(a) will ensue." *Id.* at n.21. The Commission can, under Section 1103(a), impose conditions that it deems just and reasonable. 66 Pa.C.S. § 1103(a).

One of the factors that our Supreme Court identified in *City of York* is that the Commission should consider, in determining whether there is an affirmative public benefit:

> [A]t least in a general fashion, the effect that a proposed merger is likely to have on future rates to consumers. Along with the likely effect of a proposed merger upon the service that will be rendered to consumers, the probable general effect of the merger upon rates is certainly a relevant criteria of whether the merger will benefit the public.

*City of York*, 295 A.2d at 829.

The OCA contends that the Commission did not meet the *City of York* standard because it did not address the impact that the transaction would have on the rates of Aqua's existing ratepayers and the reasons for concluding that there is a public benefit were not substantial.

## A.

Separate and apart from not considering its impact on rates, the OCA contends that Section 1102's determination is not supported by substantial evidence because the reasons given for approving the transaction do not show that there are

17

substantial affirmative benefits flowing to its ratepayers. It contends that the affirmative public benefits the Commission identified — regionalization that allows the sharing of the expertise of wastewater professionals, the resultant economies of scale, and the acquisition will have no negative effect on the quality or quantity of service provided to existing Aqua customers — are insufficient to show a substantial affirmative benefit to ratepayers. Referring back to the ALJ's Recommended Decision, it contends that those reasons are overly general in nature and that Aqua has not demonstrated or quantified by record evidence how this particular acquisition will further any goal of regionalization and consolidation.

In *Verizon*, our Supreme Court addressed what is considered substantial evidence to support the finding that there would be a public benefit from a merger of telecommunications companies. In that case, we held that the merger applicants failed to develop in sufficient detail what particular telecommunication service benefits would be advanced by the proposed corporate combination to meet the Section 1103 requirement of public benefit as well, and presented no evidence that any of the asserted benefits would not exist in the absence of the merger. While our Supreme Court agreed with this Court that the applicants did not offer any evidence regarding particular services and/or products, it reversed, holding that an acquiring utility is not required to offer specific evidence on how the transaction would offer substantial public benefit over the incumbent utility. Rather, as long as the reasons the applicant advances are a public benefit, even if the reasons as well as the means by which they are to be achieved are general in nature, these reasons, if accepted by the Commission, constitute substantial evidence to find that there is a public benefit sufficient to justify finding that the merger is in the public interest under Section 1103 of the Code.

18

In this case, the Commission found that Aqua, as the owner of numerous water and wastewater systems in the Southeastern Pennsylvania, has sufficient expertise to operate the system and has the ability to raise capital to support the system. The Commission also found that it has a policy of consolidation and regionalization of its wastewater assets that allows for the increased maintenance, upgrade and expansion of public sewer and water facilities. These reasons are of the type that the Supreme Court in *Verizon* held were sufficient to meet the Section 1103 public benefit standard. As per *Verizon*, these aspirational statements are substantial evidence to support the notion that there is a public benefit for the merger.

**B.**

Even if those considerations constitute substantial evidence, the OCA contends that the Commission failed to consider the effect those rates would have on Aqua's existing ratepayers. It argues that the Commission failed to consider that by adding the $29.5 million sales price to Aqua's rate base, rates would necessarily have to increase to fund an estimated $4.5 million increase in revenue requirement to give Aqua the requisite rate to recover the sales price and associated expenses of the transaction. It argues that because of the uncontradicted evidence that rates would increase substantially, the Commission was required to consider this in determining whether substantial benefits would flow from the transaction.

Notwithstanding *City of York*, the Commission appears to contend that it does not have to consider the impact that acquisition will have on rates because, at the time of the Section 1329 proceeding, Aqua had not yet proposed any changes in the rates to Aqua's or New Garden's ratepayers. It then goes on to argue that a Section 1329 acquisition proceeding is not the appropriate context for addressing ratemaking

19

issues because without cost studies, potential cost allocation or possible rate designs, the Commission would be asked to determine the impact on rates without sufficient or substantial evidence. Without explicitly saying so, implicit in its argument is the notion that within its discretion to approve the transaction, it may also, as a condition of approval, defer consideration of the impact of rates to rate base cases.

Aqua, however, does not dispute that a Section 1329 acquisition's impact on rates has to be considered in determining whether there is a substantial public benefit. It contends, though, that the Commission did so by directing Aqua to file a cost-of-service study in its next rate case and address the pros and cons of designing New Garden rates as a separate rate group or rate zone. If that occurred, it argues that its existing ratepayers would not be required to subsidize Aqua's acquisition. It also notes that the Commission retained the authority to allocate revenues in the next rate base proceeding, if appropriate, to Township customers that are in excess of the restrictions outlined in the APA as well as to make it and its shareholders bear all risk of a shortfall between revenues it is permitted to recover under its APA if the Commission so orders.

Section 1329 allows a private utility to acquire a government utility's assets at its fair market value rather than at the original cost of assets minus the accumulated depreciation and then add that amount to the rate base. Valuing the assets at fair market value rather than cost will usually result in a higher price for the assets added to the rate base than the one previously used. All things being equal, this increase in the rate base amount will normally require extra revenues to support the purchase price as well as an increased rate of return, because the private utility, not being tax exempt, will have higher capital costs and a right to a profit. However,

20

Section 1329(d)(1) of the Code recognizes that the sale will have to be approved under Section 1102 of the Code, and the Commission must take into consideration the effect of rates if the sale is approved.

Because *City of York* requires the impact on rates to be considered, the Commission must address that impact when deciding whether there is substantial public benefit. Contrary to its contention that impact on rates can only be addressed in a rate base case, the impact on rates can be addressed without all the cost-of-service studies, rate base valuations or rate-of-return calculations. All that *City of York* requires is that the impact be addressed "in a general fashion." *City of York*, 295 A.2d at 829. This could be achieved by addressing the OCA's undisputed evidence of the effect of adding the purchase price to the calculations used to set the existing tariff and determine the impact on rates for existing and New Garden customers. It could then address the impact on those rates in making its determination that substantial affirmative benefits flow to its ratepayers.

As to Aqua's argument that the Commission did consider the impact on rates by attaching conditions that required Aqua to file a cost-of-service study in its next rate base case addressing the pros and cons of designing New Garden rates as a separate rate group or rate zone, that ignores that if in that later rate base proceeding, the Commission decided not to place New Garden customers in a separate rate class or make New Garden a separate zone, then the OCA's undisputed evidence shows that rates will substantially increase and it would then be too late to have any impact on its approval of the acquisition. However, if in that later rate base proceeding, the Commission decided not to place New Garden customers in a separate rate class or

21

make New Garden a separate zone, then the OCA's undisputed evidence shows that rates will substantially increase.

Simply, by approving the sale and then putting off the consideration of the impact on rates to a later rate base proceeding, the Commission cannot do the balancing test required by Section 1102 of the Code to weigh all the factors for and against the transaction, including the impact on rates, to determine if there is a substantial public benefit. It is in this proceeding that the Commission is charged with deciding whether the impact on rates based on the OCA's undisputed evidence was outweighed by the other positive factors that the acquisition served a substantial public benefit. Because it did not do so, this matter is remanded to the Commission to make that determination, including the propriety of the rate restriction on New Garden ratepayers set forth in the APA.

**IV.**

Finally, the OCA contends that Aqua and New Garden ratepayers' due process rights were violated because they had no opportunity to be heard prior to the Commission's approval of the $29.5 million rate base for the New Garden system under Section 1329 because adequate notice was not provided to those ratepayers simply by notice in the Pennsylvania Bulletin as a newspaper of general circulation in the New Garden service territory.

Procedural due process does not require notice and a hearing in every conceivable situation involving administrative action. In the public utility area, our Supreme Court, in *Allegheny Ludlum Steel Corporation v. Pennsylvania Public Utility Commission*, 459 A.2d 1218 (Pa. 1983), addressed whether notice and a

22

hearing was necessary when electric rates increased as a result of the automatic adjustment of rates for fuel costs provided for in Section 1307 of the Code, 66 Pa.C.S. § 1307. It held that notice and a full hearing is not required for those increases because utilities did not have exclusive control over the cost of fuel. In *Masthope Rapids Property Owners Council v. Pennsylvania Public Utility Commission*, 581 A.2d 994, 1000 (Pa. Cmwlth. 1990), we further explained that notice and hearing was not required because:

> [I]n all such proceedings the Commission's review is appropriately characterized as preliminary and cursory. Indeed, the very function of the typical automatic adjustment clause is to permit rapid recovery of a specific *identifiable* expense item, with a more comprehensive analysis upon reconciliation of actual costs with previously projected costs used to establish the effective rate. The initial process is essentially a mathematical review of the projections provided by the public utility.

(Emphasis in original.)

However, these procedural safeguards should accompany a situation where the administrative action is adjudicatory in nature and involves substantial property rights. *Conestoga National Bank of Lancaster v. Patterson,* 275 A.2d 6, 9 (Pa. 1971). Because an increase in rates involves a substantial property right, ratepayers are entitled to notice of a Commission's administrative proceeding in which a decision is made to increase rates in a subsequent rate base proceeding. *Barasch v. Pennsylvania Public Utility Commission*, 546 A.2d 1296, 1305-1306 (Pa. Cmwlth. 1988); U.S. Const. amend. XIV, § 1.

23

In *Barasch*, a utility sought authorization from the Commission to pass charges to ratepayers from privately negotiated contracts authorized by the federal Public Utility Regulatory Policies Act of 1978 (PURPA).[13]  Under those contracts, the utility was obligated to purchase the energy and capacity of a 43-megawatt generating unit for a period of 30 years.  The utility agreed to pay a variable energy charge for each kilowatt-hour produced by the project at a rate equal to actual monthly experienced energy costs of "proxy units" of the utility.  In addition, West Penn Power Company agreed to make a capacity payment of 3.3 cents per kilowatt-hour, which it calculated to be the levelized value cost (at the time of signing the contract) of the capacity that it could avoid over the term of the contract.  In addressing whether ratepayers were entitled to notice, we stated:

> Applying analyses from these cases to the present case, we conclude, first, that substantial property interests are involved here.  If the contract between West Penn and [Milesburg Energy, Inc.] provided only for payment of *energy costs*, then the contract could not have the effect of increasing customers' bills, and this case very likely would not be before us.  If customers' bills do not change, they have no money at risk, and presumably they have no other interest in whether their utility pays given energy costs to a fuel supplier or to a [qualifying facility].
>
> However, because of the length of the term of this contract and its legally enforceable guarantees of delivery of power, the contract provides for *capacity* payments as well as energy payments.  Because West Penn will begin making capacity cost credit payments before the time when the capacity is actually needed, which West Penn projects to be in 1995, pass-through of these payments to West Penn's

---

[13] Pub. L. No. 95-617, 92 Stat. 3117 (1978), codified primarily in 16 U.S.C. §§ 796, 791a, 823a, 824a, 824d, 824i – 824k, 824(b), 824(e), 825d, 2601 – 2603, 2611 – 2644, 2701 – 2708, and 2645.

customers will result, at least in the near term, in substantial increases in their bills unrelated to their current consumption of power—a substantial property interest. Additionally, even if West Penn had no contract with a [qualifying facility], West Penn's customers would have a substantial property interest in assuring that future capacity charges to them for construction by West Penn itself were properly justified and calculated. We see no reason to disregard that interest because the capacity charges are to be assessed sooner rather than later.

*Barasch*, 546 A.2d at 1305, *opinion modified on denial of reargument*, 550 A.2d 257 (Pa. Cmwlth. 1988) (footnotes omitted) (emphasis in original).

Under *Barasch*, whether individualized notice is required depends on whether the outcome of the proceeding binds the Commission to increase rates. Moreover, if rates could increase, notice in the Pennsylvania Bulletin is not adequate notice to ratepayers.[14]

From a rate perspective, Section 1329 determines the rate base against which the rate of return and rate are calculated. It does so by determining the fair market value of the municipal utility assets; not original costs of the assets less depreciation. Because municipal authorities are not subject to the Commission's jurisdiction, their rates are not set on a rate base, rate of return and reconciliation of

_____

[14] The Commission's regulations relating to notice procedures for general rate increases require a utility to post notice of proposed increases in company offices, to issue news releases on the date the increase is filed, and to mail or to hand deliver a written or printed notice to each ratepayer. 52 Pa. Code § 53.45(b)(1)-(3). In lieu of the mailing or hand delivery method, "a public utility on a 1–month billing cycle filing a proposed general rate increase may notify its customers by means of a bill insert." 52 Pa. Code § 53.45(b)(4).

25

revenues expenses. Rather, municipal authorities set rates based on the revenues and expenses that are needed to operate the system and pay for its capital costs. This means that in the Section 1329 proceeding, the rate base is determined as important, maybe the *most* important element in setting rates. Because a rate base determination is fundamental to a determination of rates, under *Barasch*, individualized notice has to be given to all ratepayers of the proposed sale as well as an opportunity for them to participate in the Section 1329 proceeding.

Accordingly, because notice is required to all ratepayers, we vacate the Commission's order, direct it to provide notice to all ratepayers in accordance with 52 Pa. Code § 53.45, and receive additional evidence from ratepayers regarding the acquisition and then enter a new order consistent with this opinion.[15]

_____
DAN PELLEGRINI, Senior Judge

Judge Fizzano Cannon did not participate in this decision.

_____

[15] The OCA also argues that the Commission erred in applying the six-month time limitation associated with Section 1329, which requires a determination within six months as to whether there is a substantial, affirmative public benefit under Section 1102, which does not have similar time limits. It does not contend that it suffered any prejudice in the preparation of its case by the six-month limitation.

While Section 1102's application is not required to be decided within six months, that does not mean that the Commission cannot decide that six months is a reasonable amount of time to determine the Section 1102 application. Given the interdependence of the Section 1329 application with the Section 1102 application, that there is no allegation that the OCA was prejudiced by the Commission deciding the case within six months, and Aqua's status as a certified public utility providing regional service, the Commission's imposition of the six-month time frame was reasonable and well within its discretion in conducting adjudicative proceedings.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tanya J. McCloskey, Acting   :
Consumer Advocate,   :
              Petitioner   :
  :
           v.   : No. 1624 C.D. 2017
  :
Pennsylvania Public Utility   :
Commission,   :
            Respondent   :

# **O R D E R**

AND NOW, this 11<u>th</u> day of <u>October</u>, 2018, the order of the Pennsylvania Public Utility Commission, Docket No. A-2016-2580061, entered June 29, 2017, is vacated and the matter is remanded to conduct proceedings in accordance with this opinion.

Jurisdiction relinquished.

_____
DAN PELLEGRINI, Senior Judge