# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| Patrick M. Cicero, | | : | |
| | Petitioner | : | |
| | | : | |
| v. | | : | No. 910 C.D. 2022 |
| | | : | Argued: June 5, 2023 |
| Pennsylvania Public Utility | | : | |
| Commission, | | : | |
| | Respondent | : | |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER           FILED: July 31, 2023

Patrick M. Cicero, the Consumer Advocate (Petitioner), petitions for review of the July 29, 2022 Opinion and Order (Opinion and Order) of the Pennsylvania Public Utility Commission (Commission) that, in relevant part, approved the application of Aqua Pennsylvania Wastewater, Inc. (Aqua): to acquire the wastewater system assets (System) of East Whiteland Township (Township); to offer, render, furnish, and supply wastewater service to the public in the areas served by Township's System; and to establish a ratemaking rate base of the System's assets under Section 1329(c)(2) of the Public Utility Code (Code), 66 Pa.C.S. § 1329(c)(2) (Application). The Commission also approved an Asset Purchase Agreement, and related contracts, between Aqua and Township. The Commission held Aqua demonstrated that approving the Application and granting Aqua a certificate of public convenience (CPC) would provide affirmative public benefits that outweighed the potential harms as required by Sections 1102 and 1103 of the Code, 66 Pa.C.S. §§ 1102, 1103.

On appeal, Petitioner argues the Commission erred in finding that Aqua's acquisition of the System met the standards set forth in Sections 1102 and 1103 by providing affirmative public benefits, **specific** to this transaction rather than those related to Aqua's larger size and its resultant technical and financial fitness, that outweighed the harms of the acquisition, which include an increase in the cost of wastewater service to both existing and new Aqua (former Township) customers.[1] Petitioner further asserts that precedent does not support the Commission's decision and that the Commission erred in relying on Section 1329 of the Code, 66 Pa.C.S. § 1329, for the Commission's policy of promoting consolidation and regionalization of wastewater authorities. Finally, Petitioner contends the Commission's findings that Aqua's acquisition of the System will result in affirmative public benefits are not supported by substantial evidence.

The Commission, along with Township and Aqua (Intervenors), which have intervened in the appeal, argue Petitioner's legal challenge to the Commission's application of Sections 1102 and 1103 is without merit because it is apparent from the Opinion and Order that the Commission performed a fulsome analysis and balancing of the affirmative benefits and the potential harm that is consistent with the Code and precedent. They also assert the findings of fact are supported by substantial evidence, and Petitioner's substantial evidence challenge impermissibly seeks to have the Court reweigh the evidence.

## I. BACKGROUND

### A. *Factual History*

Aqua is a Pennsylvania public utility that holds a CPC to provide wastewater service to approximately 45,000 customers in various counties within the

---

[1] We have combined Petitioner's arguments for ease of discussion.

Commonwealth, including within Chester County, which includes Township.[2] (Opinion and Order (Op.) at 4.) Aqua operates 39 wastewater treatment plants. (*Id.*) Township is a Second Class township located in Chester County and owns the System, which provides sanitary wastewater service to about 3,895 residents of Township. (*Id.*) Township and Aqua entered into the Agreement on January 8, 2021, for the sale of the rights, assets, and properties of the System for the price of $54,930,000.00. (*Id.*) Township and Aqua engaged in the process set forth in Section 1329(c),[3] which is used to ascertain the fair market value (FMV) of the System's assets and ratemaking rate base and resulted in an average value of $56,724,729.00. (*Id.* at 2 n.2.) The "[r]atemaking rate base" is "[t]he dollar value of a selling utility which, for post[ ]acquisition ratemaking purposes, is incorporated into the rate base of the acquiring public utility or entity." 66 Pa.C.S. § 1329(g). Aqua agreed to continue Township's existing rates for at least three years after closing. (*Id.* at 5.) Thereafter, Aqua filed the Application, seeking approval of the Agreement and other related agreements and contracts, a CPC to offer service to Township's customers, and a ratemaking rate base of $54,930,000.00. (*Id.* at 1-2.)

---

[2] Aqua is a subsidiary of Aqua Pennsylvania, Inc., which is the second largest investor-owned water utility in Pennsylvania and provides water and wastewater services to 488,000 customers. (Recommended Decision (R.D.) Finding of Fact ¶ 4.)

[3] Section 1329(a) sets forth the process for determining the fair market value (FMV) of water and wastewater utilities through the use of two utility valuation experts to appraise the utility, using cost, multiple, and income approaches. 66 Pa.C.S. § 1329(a). Section 1329(c) addresses the ratemaking rate base and relevantly provides that the selling utility's ratemaking rate base shall be incorporated into the rate base of the acquiring public utility during the latter's next base rate case, and "[t]he ratemaking rate base of the selling utility shall be the lesser of the" negotiated purchase price or the FMV of the selling utility. 66 Pa.C.S. § 1329(c).

## B. Proceedings Before the Administrative Law Judge

The Application was assigned to Administrative Law Judge Marta Guhl (ALJ Guhl). Petitioner's office, the Office of Consumer Advocate (OCA), filed a protest to the Application, as did a Township customer. (Op. at 1 & n.1, 2.) The Office of Small Business Advocate (OSBA) and the Commission's Bureau of Investigation and Enforcement (I&E) participated in the proceedings. (*Id.* at 1 & n.1.) ALJ Guhl held a telephonic public input hearing at which six people presented statements that raised concerns of Aqua water customers and System customers that their rates and fees would increase due to the acquisition, that asserted the System operated without issue for decades, and that, at times, Aqua had not provided safe and reliable water service. (Recommended Decision (R.D.) at 14-16.) An evidentiary hearing, at which the parties waived cross-examination of the witnesses and moved their pre-served testimony and exhibits into the record, also was held. Aqua offered the direct, rebuttal, and, in some cases, surrebuttal written testimony of William C. Packer, (Aqua Statement 1, 1R, 1SR), Mark J. Bubel, Sr., (Aqua Statement 2, 2R), and John Nagel, (Aqua Statement 3, 3R).[4] The OCA presented the direct and surrebuttal

___

[4] Packer, Vice President of Regulatory Accounting of Aqua PA's parent and Regional Controller of Aqua PA, oversees rates and regulatory accounting measures and testified about the transaction and Aqua's technical, legal, and financial fitness, as well as the benefits of the transaction that he perceived. (Reproduced Record (R.R.) at 1729a-31a.) In particular, Packer testified that the acquisition of the System would result in a larger customer base, which he believed would reduce the incremental cost of future investments for all customers, as they would be spread out over more customers. (*Id.* at 1743a.) He also indicated that Aqua's size meant that the System could enjoy the benefit of savings resulting from economies of scale, System customers would experience a reduction in operating costs from $2.8 million to $2.0 million, which is approximately 29%, and that the transaction would support the Commission's policy of promoting consolidation and regionalization. (*Id.* at 1739a-40a, 1742a-43a.) Packer further explained that, because Aqua owns and operates the water system and the two systems are in proximity to each other, there is the opportunity for Aqua to coordinate activities to minimize disturbances in the community. (*Id.* at 1742a.) Finally, Packer testified that System customers would have access to **(Footnote continued on next page…)**

testimony of Noah D. Eastman, a regulatory analysist with the OCA. (OCA Statement 2, 2SR.)

Aqua, as the proponent, introduced evidence indicating that it has net assets of $350 million and annual revenues of $32 million, and access to its parent's, Aqua Pennsylvania, Inc. (Aqua PA), financing capabilities. (R.D., Finding of Fact ¶ 19.) Aqua intends to provide management, customer service, engineering, regulatory compliance, financial, and ancillary services from its Southeastern Division Office in Bryn Mawr. (*Id.* ¶ 23.) Aqua has 27 wastewater operators, many of whom hold dual water and wastewater certifications, and would hire three additional operators

a toll-free customer service number, multiple billing enhancements – like online billing, dedicated emergency response available 24/7/365, and customer assistance program, which offers assistance for low-income customers. (*Id.* 1743a-44a, 2156a.)

Bubel, a civil engineer and Project Engineer III for Aqua, testified about how the System would be integrated into Aqua's system, Aqua's technical fitness to operate the System, and the benefits of the transaction that he perceived. (*Id.* at 1764a-65a.) Bubel testified that Aqua had a local office near Township and could provide seamless "[m]anagement, customer service, regulatory compliance, engineering, financial and ancillary services" to the System's customers, as well as additional operators for the System, including 3 new and 27 existing operators. (*Id.* at 1776a-77a.) He explained that, unlike Township, Aqua had in-house environmental compliance experts and an in-house laboratory that could quickly identify potential issues in the System. (*Id.* at 2166a.) Bubel testified that both System customers and Aqua customers will benefit from the sharing of financial and infrastructure risks, and Aqua had agreed to make needed infrastructure upgrades, which were identified in Aqua's due diligence examination of the System, in the amount of $16.92 million over 10 years. (*Id.* at 1771a-72, 2164a-65a.)

Nagel, Township's Manager, testified that he oversees the day-to-day operations for all of Township's departments and addressed, among other topics, the anticipated benefits of the sale of the System. (*Id.* at 1785a.) Those benefits, he explained, included, allowing Township to leave the sanitary sewer business and reallocate its resources and administration time to other core governmental functions, the ability of Township to use the proceeds toward various Township projects, and the ability of System customers to have access to expanded customer service and operational functions that Aqua could provide. (*Id.* at 1785a-86a, 1789a, 1791a-92a.) Nagel further testified that "[t]he System's aging infrastructure will require additional investment over time, which [Township] project[ed] will cause increases in rates if the System remains with [] Township." (*Id.* at 1789.) The potential purposes for the sale proceeds, Nagel testified, was to reduce debt, develop a Township campus, construct a new police station, implement road projects, and renovate its current building. (*Id.* at 1791a-92a.)

to perform the day-to-day operations of the System, although the operators could be used in other area systems. (*Id.* ¶¶ 23-24.) Although Aqua was not aware of any current environmental issues for the System, a 2019 report indicated the System experienced capacity-related by-passing, and sanitary sewer overflows, or surcharges, and that the System's inflow and infiltration had to be addressed. (*Id.* ¶ 27.) Aqua offered additional evidence showing a variety of benefits it contended were affirmative public benefits it believed would support granting the Application, including: long-term investments in capital infrastructure; enhanced customer service options, such as a 24/7/365 toll-free customer service number and online billing; savings through economies of scale; the availability of customer assistance programs; the ability to spread risk over more customers; having in-house environmental and regulatory experts and laboratory; and the ability to coordinate projects with the water system in Township, which is also owned by Aqua, so as to reduce disruption in the community.

OCA offered evidence reflecting that the net book value of the System was $33.4 million, not reflecting an offset for contributed plant or capital, and Township would receive $54.93 million from the transaction, which is more than 64% of the net book value of the System. (*Id.* ¶¶ 28-29.) Aqua anticipated that it would spend $16.92 million for capital improvements to the System in the next 10 years. (*Id.* ¶ 30.) Aqua calculated that the acquisition would result in an annual revenue deficiency of $5.011 million that would be recovered from either System customers, its existing customers, or both. (*Id.* ¶ 31.) Aqua agreed to freeze System **customers' rates** at **$33.33 per month** for three years following the transaction, but thereafter **those rates could increase to $77.64 a month**, a 132.93% increase if the entire

6

deficiency was recovered from those customers. (*Id.* ¶¶ 35-37.[5]) If the deficiency recovery was split between the System's customers **and Aqua's current customers**, the System's customers would see an increase of 66.47%. (*Id.* ¶ 39.) Further **increases in rates** could also be experienced by Aqua's water customers in Township. (*Id.* ¶ 34.) There was **no showing** that rates would become more **affordable** as a result of this transaction. (*Id.* ¶ 42.) OCA also presented evidence that reflected, what it viewed, as benefits to the System's customers for remaining a municipal authority, including **no shareholders** and **no obligation to pay taxes**. (*Id.* ¶¶ 48, 50.)

As to the System, evidence was introduced reflecting that **it has the capacity** to meet the demands of current and future customers, there had been no sanitary system overflows in 2020, it was not under any corrective action plan with the Department of Environmental Protection, and problems during business hours could be handled directly by the sewer department and after-hours problems would be handled by contacting the police which would contact the on-call employee. (*Id.* ¶¶ 51-53.) Township has the means to provide continued service to its existing, and even future customers, as well as complete needed future upgrades. (*Id.* ¶¶ 54-56.) Township desires the sale so that it can exit the sanitary sewer business, focus its resources and efforts on other core governmental functions while ensuring the continuation of safe, reliable service, and use the proceeds from the sale to reduce its debt and fund other projects without the need of a tax increase. (R.D. at 34.)

After review, ALJ Guhl issued a Recommended Decision that the Application **be denied**. ALJ Guhl credited the public opposition to Aqua's acquisition of the

---

[5] Although ALJ Guhl found that the cost could increase by an **additional** $77.64 per month, for a total of a 132.93% increase, the testimony of OCA's witness, Noah D. Eastman, was that it would increase from $33.33 per month to $77.64 per month. (OCA St. 2 at 3, R.R. at 2104a.)

System, evidence that Township's service was safe and reliable and could continue without Aqua's acquisition, evidence that System customers could experience an increase of rates from $33.00 per month to $77.64 per month after the rate freeze expired, and evidence that Aqua's existing customers could also experience a rate increase if Aqua sought to recover some of its costs by adding it to those bills. (*Id.* at 53-54.) In contrast, ALJ Guhl concluded that while there was no dispute that Aqua was fit to provide the proposed service, the evidence Aqua presented identifying **the alleged substantial affirmative benefits** of the acquisition were **not proven** with specificity or were **not improvements** for the customers of the System, as Township was already providing safe and reliable service and had the financial ability to make the upcoming capital investments. (*Id.* at 51, 54-59.) ALJ Guhl concluded Aqua had to "show that benefits will substantially outweigh the harms" and that it "can improve [] Township's quality of service, operations, convenience or safety" but "the evidence **did not establish that any benefit to be realized from the proposed transaction would outweigh the harms** to current Aqua water and wastewater customers or existing [] Township wastewater customers." (*Id.* at 58-59 (emphasis added).) Thus, ALJ Guhl held Aqua failed to meet its burden of proof under Sections 1102 and 1103.

C.     *Exceptions and the Commission's Opinion and Order*

Aqua, as well as Township, filed exceptions to the Recommended Decision, challenging, relevantly, ALJ Guhl's conclusion that Aqua failed to establish that its acquisition of the System would result in affirmative public benefit as required by Sections 1102 and 1103, *Popowsky v. Pennsylvania Public Utility Commission*, 937

A.2d 1040 (Pa. 2007),[6] *City of York v. Pennsylvania Public Utility Commission*, 295 A.2d 825 (Pa. 1972), and *McCloskey v. Pennsylvania Public Utility Commission*, 195 A.3d 1055 (Pa. Cmwlth. 2018).[7] They contended ALJ Guhl did not correctly apply *City of York* and *Popowsky* in reaching that conclusion. Aqua further excepted to ALJ Guhl's conclusion that the adverse impacts of the transaction outweighed the benefits of the proposed transaction, of which ALJ Guhl concluded there were none. Township also excepted on the basis that ALJ Guhl's standard would require municipal authority systems to be in dire circumstances before they can be sold under the Code. Petitioner responded to these exceptions asserting there was no error in ALJ Guhl's application of the Code and precedent to the record here and Aqua's and Township's arguments are based on a misreading of the Recommended Decision.

Upon its review, the Commission granted the exceptions, approved the Application, and granted the CPC. The Commission held, under *McCloskey*, "the balancing test under Section 1102 . . . [is] to weigh all the factors for and against the transaction, including the impact on rates, to determine if there is a substantial public benefit," "aspirational statements are substantial evidence," and the Commission was "charged with deciding whether the impact o[n] rates . . . is outweighed by . . . other positive factors that . . . served [as] a substantial public benefit." (Op. at 29, 32 (quoting *McCloskey*, 195 A.3d at 1065-67) (alterations in original) (emphasis omitted).) The Commission found there was no credible dispute as to Aqua's technical and financial fitness to be the certificated provider of the System. (*Id.* at

---

[6] The parties refer to this opinion either as *Popowsky* or *Verizon*. We will refer to it as *Popowsky*.

[7] The parties refer to this opinion either as *McCloskey* or *New Garden*. We will refer to it as *McCloskey*.

9

33-34.) On the issue of the benefits of the proposed transaction, the Commission found Aqua's evidence established numerous public benefits.[8]

The Commission cited to its policy on **promoting consolidation** and regionalization of water and wastewater systems through the "[a]cquisition[] of **smaller systems by larger** more viable systems," which, it believed, "likely improve[d] the overall long-term viability of the water and wastewater industry,"

---

[8] The Commission cited, among other things:

- Aqua's provision of in-house environmental compliance experts and laboratory, which can quickly identify potential issues (Rebuttal Testimony of Bubel, Aqua St. 2R at 4, R.R. at 2166a);

- Aqua's larger customer base, which will increase by nine percent with the acquisition, will share any future infrastructure investments at a lower incremental cost per customer (Direct Testimony of Packer, Aqua St. 1 at 17, R.R. at 1743a);

- Aqua's larger size means savings can be achieved via economies of scale (*id.*);

- Aqua, which owns and operates Township's water system, and the proximity between the two systems can provide opportunities to coordinate capital activities so to minimize disturbances within Township (Direct Testimony of Packer, Aqua St. 1 at 16, R.R. at 1742a);

- System customers will benefit from an approximate reduction in operating expenses of 29% (*id.*);

- System customers will have access to a toll-free customer service number, multiple billing enhancements, dedicated emergency response available 24/7/365, and customer assistance programs (Direct Testimony of Packer, Aqua St. 1 at 17-18, R.R. at 1743a-44a; Rebuttal Testimony of Packer, Aqua St. 1R at 19, R.R. at 2156a);

- Township can leave the sanitary sewer business, focus its resources on other core governmental functions, and can use the proceeds from the transaction for redevelopment opportunities (Direct Testimony of John Nagel, Aqua St. 3 at 8, R.R. at 1789a).

(Op. at 34-43.)

"enhance[d] the quality of ratepayers' daily lives," and "generally serve[d] public policy goals." (*Id.* at 35 (citation omitted).) The Commission further believed Section 1329 reflected similar policy goals and the General Assembly's determination "that [FMV] acquisitions of municipal water and wastewater systems further the public interest." (*Id.* (citation omitted).) The Commission opined that the sale of municipal water or wastewater systems using the FMV process under Section 1329 "to an investor-owned public utility [could] facilitate necessary infrastructure improvements and ensure the continued provision of safe, reliable service to customers at reasonable rates." (*Id.* (citation omitted).)

As to the potential rate impact, the Commission acknowledged ALJ Guhl's focus on the increase to System ratepayers and, potentially, Aqua's current ratepayers related to the revenue deficiency associated with the proposed rate base addition to Township's existing rates, which could be as high as 132.93% if 100% was recovered from System ratepayers, going from $33.00 per month to $77.64 per month. (Op. at 43; *see* Direct Testimony of Noah D. Eastman, OCA St. 2 at 3 (explaining the increase).) However, the Commission indicated that this rate deficiency was "only a preliminary analysis of the potential rate impact on [] Township's customers" and the "figure [was] a non-binding estimate of the incremental rate effect of the proposed rate base increase" that was used for purposes of providing notice to customers under Section 1329. (*Id.*) The actual outcome on rates, the Commission observed, was indeterminate and could vary between the extremes of no impact to the 132.93% increase. (*Id.* at 43-44 (citation omitted).) The Commission explained:

> All of the [p]arties acknowledge that some level of a rate increase is expected as a result of the transaction. Indeed, there is a reasonable expectation that rates for [] Township's customers will increase even if

the Commission were to reject the Application given the level of capital expenditures considered to be necessary over the next ten years. However, we agree with Aqua and [] Township that, if the transaction is approved, there will be more flexibility to address rate impact and to allocate costs over a much larger customer base. *See, e.g.*, [Rebuttal Testimony of Packer,] Aqua St. 1-R at 15-16 (examining five years of capital investments on [Aqua's] acquired wastewater systems).

(*Id.* at 44.)

Based on its review, the Commission concluded:

When considering all the factors, including the impact on rates, we find that the benefits of Aqua's ownership outweigh the purported harms outlined by the OCA. Aqua's expertise and ability to raise and deploy capital and to spread costs over a larger customer base, [] Township's decision to exit the wastewater business, and the transaction's furtherance of the policy objectives of the General Assembly in enacting Section 1329 [(establishing the procedure for FMV sales of water and wastewater utilities)], as well as the additional factors discussed above, are all substantial affirmative benefits weighing in favor of granting the Application.

(*Id.*) Accordingly, the Commission approved the Application and granted Aqua a CPC but reduced the ratemaking rate base to $54,413,635.00. Petitioner now petitions this Court for review.[9]

## II. DISCUSSION

Petitioner first argues the Commission erred in finding that Aqua met its burden of proving, as required by Section 1102 and 1103 of the Code, that there are substantial affirmative public benefits from the proposed transaction that outweigh the harms of the transaction. Petitioner also argues that the Commission's findings

---

[9] "Appellate review of a [Commission] order is limited to determining whether a constitutional violation, an error of law, or a violation of [Commission] procedure has occurred and whether necessary findings of fact are supported by substantial evidence." *New Garden Township v. Pa. Pub. Util. Comm'n*, 244 A.3d 851, 862 n.7 (Pa. Cmwlth. 2020) (citation omitted).

12

of an affirmative public benefit are not supported by substantial evidence. We begin with Petitioner's first allegation of error.

### A. Parties' Arguments

Petitioner challenges the Commission's legal determination that Aqua met its burden of proof under Sections 1102 and 1103 of the Code, as interpreted in *City of York* and *McCloskey*. Petitioner argues the Commission erroneously confined its analysis to whether Aqua was technically and financially fit to provide the proposed service and whether the acquisition supported the Commission's policy of promoting regionalization and consolidation of wastewater service in Pennsylvania. Petitioner maintains that, unlike the ALJ, the Commission did not perform a fact-based analysis of this transaction, including a consideration of the rate impacts of this acquisition. Rather, according to Petitioner, the Commission erroneously relied on benefits that derive from Aqua's fitness, both financial and technical, as a large, investor-owned utility, which would be present in any acquisition by Aqua, and should have examined what benefits would result from the facts of the actual transaction at issue. Here, Petitioner asserts, as found by ALJ Guhl, the System is not currently in trouble and Township is financially capable of continuing to operate the System without issue; therefore, the acquisition would not offer any "substantial or necessary benefits to [Township's] customers." (Petitioner's Br. at 30-34.) Not only were there no particular benefits established, but Petitioner also argues, there were known harms that the Commission disregarded in its determination. Had the Commission "properly weigh[ed]" the facts in this matter, as the Commission did in *Application of CMV Sewage Co., Inc.*, No. A-230056F2002, 2008 WL 5786553 (Pa. PUC Dec. 23, 2008) (*CMV Sewage*), Petitioner asserts, the harm of the known rate increases outweighed the speculative and "aspirational" benefits Aqua purportedly

established, which would be present in **any** Aqua acquisition, and *Popowsky* should not be read as holding that any and all aspirational benefits are sufficient. (Petitioner's Br. at 26, 36-38.) Petitioner contends that the Commission abused its discretion, in that it executed its judgment manifestly and unreasonably, and did not consider all the relevant factors in arriving at its conclusion. (*Id.* at 34-35.) Finally, Petitioner argues the requirements of Sections 1102 and 1103, and the analysis under *City of York*, is not altered by the fact that the acquisition proceeded under Section 1329, which the Commission erred in relying on to find affirmative benefits here. (*Id.* at 46-47.) In this regard, Petitioner maintains the Commission erroneously ascribes its policy of promoting consolidation and regionalization to the General Assembly through the Commission's interpretation of Section 1329 as supporting that policy.

The Commission asserts it properly evaluated the Application under Sections 1102 and 1103 and *City of York* and its progeny and did not err in considering Aqua's fitness and the goals of regionalization and consolidation as part of, not instead of, those standards. According to the Commission, it weighed all the factors for and against the transaction, including the potential impact on rates, as required by *City of York*, and, based on that weighing, found that the transaction will result in substantial affirmative public benefits that outweigh the purported harms asserted by Petitioner. The Commission argues Aqua met its burden of proving, by a preponderance of the evidence, that it met the *City of York* standards, which can be done through aspirational statements and predictive evidence under *Popowsky* and *McCloskey*. The Commission contends the policy of encouraging regionalization and consolidation was recognized as a valid benefit under Section 1103. (Commission's Br. at 22 (citing *McCloskey*, 195 A.3d at 1065).) Section 1329

reflects, in the Commission's view, the General Assembly's intent that FMV acquisitions of municipal water and wastewater systems are in the public interest. The Commission argues rate increases are common in these matters, and it was not error for the Commission to weigh the long-term benefits, which were numerous, against the potential short-term harms, which would not be absolutely determined until Aqua's next rate case. Finally, the approval of the Application and grant of the CPC are matters within its administrative expertise, the Commission argues, and are entitled to deference, not reweighing by the Court.

Aqua similarly argues the Commission applied the proper standard under Sections 1102 and 1103 and precedent, including *City of York* and *Popowsky*, in granting the Application. The Commission did not, Aqua asserts, rely only on Aqua's fitness and the Commission's policy favoring consolidation and regionalization, which is apparent from the Commission's Opinion and Order's reference to not only those items, but also to numerous benefits that would be experienced as part of the transaction. According to Aqua, the Commission's judgment in this matter is entitled to deference because its findings are supported by substantial evidence and its weighing of the benefits and harms is not inconsistent with precedent. Aqua maintains it established numerous affirmative public benefits and the harms, the potential increase in customer rates, only had to be considered "in a general fashion" under *City of York* and *McCloskey*. (Aqua's Br. at 8.) Contrary to Petitioner's arguments and ALJ Guhl's decision, Aqua argues it did not have to show that its acquisition of the System would result in a "material improvement to the terms, conditions, safety, or reliability of service under Aqua's ownership as compared to []Township's ownership" to the System's customers. (*Id.* at 17-18

15

(quoting Petitioner's Br. at 10).) According to Aqua, there is no support for such a standard in *City of York* or its progeny.

Township adopts Aqua's arguments but separately argues accepting Petitioner's arguments would require a municipality to "wait until a situation is dire before engaging in the type of transaction at issue in this proceeding" instead of "engag[ing] in responsible and proactive governance on behalf of its constituents and acting with the foresight to anticipate problems before they occur." (Township's Br. at 20.) The Code does not require, Township asserts, proof that a system be distressed or that its customers are suffering from poor operations before the system can be sold.

### B. Analysis

This matter arises out of the Commission's conclusions that Aqua met its burdens of proof under Sections 1102 and 1103 of the Code. Section 1102(a)(1) and (3) of the Code requires a public utility to obtain a CPC from the Commission "to begin to offer, render, furnish or supply within this Commonwealth service . . . to a different territory than that authorized by" another CPC and to "acquire from . . . any . . . municipal corporation, by any method or device, . . . including the sale . . . of[] any tangible or intangible property used or useful in the public service." 66 Pa.C.S. § 1102(a)(1), (3). Section 1103(a) addresses the grant of a CPC and states, in relevant part: "A [CPC] shall be granted . . . **only if** the [C]ommission shall find or determine that **the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public**." 66 Pa.C.S. § 1103(a) (emphasis added). Under our Supreme Court's decision in *City of York*, to grant a CPC, the Commission must find that the proposed transaction will "**affirmatively promote** the service, accommodation, convenience, or safety of the

16

public **in some substantial way**." 295 A.2d at 828 (quotation marks omitted) (emphasis added). The standard used to determine whether a transaction is in the public interest is referred to as the "affirmative public benefits" test. *Popowsky*, 937 A.2d at 1052-53, 1055.

As our Supreme Court has explained, the affirmative public benefits test does not require the Commission "to secure legally binding commitments or to quantify benefits where this may be impractical, burdensome, or impossible." *Id.* at 1057. Instead, the Commission is to "make factually-based determinations" applying the preponderance of the evidence standard. *Id.* Under this evidentiary standard, the Commission is "not required to ensure beyond all doubt that the noted public benefits would accrue." *Id.* at 1055 n.18. Rather, the preponderance of the evidence standard "means only that one party has presented evidence that is more convincing, by even the smallest amount, than the evidence presented by the other party." *Energy Conservation Council of Pa. v. Pub. Util. Comm'n*, 995 A.2d 465, 478 (Pa. Cmwlth. 2010). The affirmative public benefit standard does not require that every utility customer benefit from the proposed transaction, *Popowsky*, 937 A.2d at 1061, nor does it require that the utility's proposed action be absolutely necessary, *Hess v. Pennsylvania Public Utility Commission*, 107 A.3d 246, 262 (Pa. Cmwlth. 2014). As explained by our Supreme Court, "[w]e [] bear in mind that, on account of the Commission's expertise in the utility arena, reviewing courts accord considerable deference to the agency concerning the certification process." *Popowsky*, 937 A.2d at 1054. Accordingly, the decision to issue a CPC "falls squarely within the [Commission's] area of expertise and is best left to the [C]ommission's discretion." *Elite Indus., Inc. v. Pa. Pub. Util. Comm'n*, 832 A.2d 428, 432 (Pa. 2003). However, **such discretion is not absolute**, **and** "where the judgment is manifestly

17

unreasonable or **where the law is not applied**," that **discretion is abused**. *Commonwealth v. King*, 839 A.2d 237, 240 (Pa. 2003) (emphasis added).

We begin with Petitioner's contention that the Commission confined its affirmative public benefits analysis only to Aqua's technical, managerial, and financial fitness and to the Commission's policy promoting consolidation and regionalization. The Commission and Intervenors respond this is not the case because the Commission cited additional benefits beyond its determination that Aqua had the technical, managerial, and financial fitness to provide the proposed service and the transaction was consistent with its policy. A review of those "additional" benefits, however, reveals that they derive, as Petitioner argues, from Aqua's size and associated technical, managerial, and financial fitness, and will be present in any acquisition by Aqua (or similarly large utility) of a smaller utility, and not from Aqua's acquisition of the System specifically. While fitness, which is presumed when the acquiring utility is already certificated, *McCloskey*, 195 A.3d at 1058, is a consideration in determining whether to approve a transaction, a determination that a utility is fit to provide the proposed service is separate from the determination that the transaction will result in affirmative public benefits that outweigh the harms thereof. Were it not, as Petitioner argues, a utility's fitness to provide a service could subsume the affirmative public benefits test.

Moreover, Section 1103(a), as interpreted by *City of York*, requires that the proposed transaction "**affirmatively promote** the service, accommodation, convenience or safety of the public **in some substantial way**." 295 A.2d at 828 (emphasis added). The financial, technical, and managerial "benefits" the Commission concluded could result from this transaction relate to and/or are not benefits that "**affirmatively promote** the service, accommodation, convenience, or

18

safety of the public **in some substantial way**." *Id.* (quotation marks omitted) (emphasis added). This is because the System is **already** providing and is capable of providing the same or similar benefits without the acknowledged rate increase that will occur as a result of the acquisition.

For example, Aqua's ability to provide enhanced customer service, such as a toll-free line that is available 24/7/365, and in-house engineers, experts, and a laboratory, is because it is a large, technically fit utility. Moreover, the System already provides customer service 24/7/365, even if part of that service requires calls to the police after hours, and there is no evidence the System lacks the ability to provide safe and reliable service due to its lack of in-house capabilities. While Aqua has committed to spend $16.92 million for capital improvements, which it can guarantee due to its size and financial fitness, Township is likewise capable, and has the funds on hand, to complete the needed improvements and upgrades, without the financial burden of funding Aqua's purchase. Finally, although Township would receive funds from the sale, which could be used for other governmental purposes, those funds are available because the System's customers, and potentially Aqua's current customers, will bear the burden of the costs of that acquisition. Holding that a transaction will result in substantial affirmative public benefits because it will provide the **same services** as **already being provided** is not a benefit, let alone a substantial affirmative public one as required by statute and our caselaw. Nor is it a benefit to provide for upgrades that Township is equally capable of providing. Holding that these services and upgrades that are the result of the acquiring utility's size and fitness are substantial affirmative public benefits is not consistent with *City of York* and its progeny. This is particularly true when the existing system is already operating safely and reliably. As our Supreme Court described in *Popowsky*, the

19

affirmative public benefit test is a "**net** benefits assessment." 937 A.2d at 1056 (emphasis added). Where, as here, there are **no benefits that differ substantially** from the benefits already being provided by the existing system operator, those alleged benefits arise as a result of the acquiring utility's fitness, rather than from the actual transaction, and where there are acknowledged or known harms that will result from the transaction, there are insufficient net benefits to support approving the transaction and granting the CPC under Section 1103(a). Where the law is not applied, an agency abuses its discretion. *King*, 839 A.2d at 240.

Petitioner further argues that *Popowsky*, *City of York*, and *McCloskey* do not support the conclusion that affirmative public benefits derived from "aspirational statements" or benefits that cannot be quantified at the time of the transaction will **always** warrant the approval of a transaction. While Pennsylvania courts have recognized that the Commission is not required to obtain legally binding commitments from acquiring utilities and that "aspirational statements" are substantial evidence of an affirmative public benefit, under the preponderance of the evidence standard, that recognition must be considered in the context of those cases. *Popowsky*, 937 A.2d at 1055-57 & n.18; *City of York*, 295 A.2d at 829-30; *McCloskey*, 195 A.3d at 1065-66.

In both *Popowsky* and *City of York*, the benefits of the particular transaction, the merger of Verizon and MCI and the merger of three telephone companies, were reviewed, respectively, rather than reliance on benefits that would arise from **any** transaction involving a large utility acquiring a smaller utility. *Popowsky*, 937 A.2d at 1057-61; *City of York*, 295 A.2d at 829. Further, in both *Popowsky* and *City of York*, the Supreme Court ultimately determined that the mergers would result in positive benefits to the affected parties and there was no or limited evidence of

20

detrimental results from the transactions against which to weigh the benefits. *Popowsky*, 937 A.2d at 1059-61; *City of York*, 295 A.2d at 829-30. Finally, although this Court recognized in *McCloskey* that aspirational statements regarding the expertise and the ability to raise capital of an acquiring utility **could** constitute substantial evidence of a public benefit of a merger, we did not reach the issue of whether such benefits **would** outweigh the known harm of increased rates to the customers because the Commission did not consider the evidence of that harm. 195 A.3d at 1065-66. Therefore, we remanded for the Commission to consider that evidence and weigh the factors in favor of the transaction and those against the transaction. *Id.* at 1069. When read in context, we agree with Petitioner that these cases do not support a conclusion that the public benefits arising from aspirational statements will **always** constitute affirmative public benefits that will be **substantial** enough to outweigh known harms.

Nothing in *McCloskey*, or in Section 1329 of the Code setting forth the procedures for acquiring water and wastewater systems for FMV, have altered the requirements of Sections 1102 and 1103. Thus, in every Section 1329 case, it must be shown that the affirmative public benefits that arise from and are specific to a transaction outweigh the harms of the transaction, such that approval of the transaction will "**affirmatively promote** the service, accommodation, convenience, or safety of the public in **some substantial way**." *City of York*, 295 A.2d at 828 (quotation marks omitted) (emphasis added). And, as stated above, the benefits or potential benefits arising from the aspirational statements of Aqua and its technical, financial, and operational assistance are not substantial enough to outweigh the known harms of this proposed transaction, making this matter distinguishable from *City of York* and *Popowsky*.

21

## III. CONCLUSION

For the foregoing reasons, the Commission erred and/or abused its discretion in concluding that Aqua established substantial affirmative public benefits that outweighed the acknowledged harms of Aqua's acquisition of the System as required by Sections 1102 and 1103 to support the approval of the Application and grant of the CPC.[10]  Therefore, we reverse.

_____

**RENÉE COHN JUBELIRER,** President Judge

Judge Fizzano Cannon did not participate in the consideration of this matter.

---

[10] Based on our resolution, we do not address Petitioner's argument that the Commission's findings of fact were not supported by substantial evidence.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Patrick M. Cicero,          :
          Petitioner      :
                      :
      v.             :    No. 910 C.D. 2022
                      :
Pennsylvania Public Utility      :
Commission,                 :
         Respondent    :

# **O R D E R**

NOW, July 31, 2023, the Order of the Pennsylvania Public Utility Commission in the above-captioned matter is **REVERSED**.

 

_____

**RENÉE COHN JUBELIRER,** President Judge